UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DENA L. MILLER, *M.D.*,
     Plaintiff,

     v.                                                     No. 3:13-cv-00679 (JAM)

IMAGING ON CALL, LLC,
     Defendant.

**RULING GRANTING MOTION TO DISMISS**

     Plaintiff is a Connecticut doctor who seeks money damages stemming in large part from efforts of a New York hospital to revoke her medical staff privileges. The twist in this case is that plaintiff has not sued the hospital or anyone there who took action against her. Instead, plaintiff has sued an *intermediary* company that arranged with the hospital for plaintiff to serve the hospital's patients. Significantly, plaintiff does not allege that defendant initiated or instigated any of the hospital's actions against her. Instead, she contends that defendant did not respond and deal with her appropriately upon receiving the hospital's complaints. For the reasons below, I conclude that plaintiff has not alleged a plausible claim of relief against defendant under any of the many contract and tort theories advanced in her complaint.

BACKGROUND

     Plaintiff Dena Miller is a board certified radiologist. She entered into a contract with defendant Imaging on Call, LLC ("IOC") to furnish teleradiology services for up to six different hospitals or trauma facilities. Doc. #12-2 at 2–3.[1] In essence, teleradiology allows for hospitals to

---

[1] Defendant's motion to dismiss attaches a copy of the contract (Doc. #12-2 at 2-9), and plaintiff has stated no objection to its consideration at the motion-to-dismiss stage. *See, e.g., Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–54 (2d Cir. 2002).

electronically transmit their patients' diagnostic images for remote reading by a qualified medical professional. The contract contemplated that a participating hospital anywhere could electronically transmit images such as X-rays, CT scans, and Ultrasounds to plaintiff at her home in Connecticut, and then plaintiff would promptly read the image and send a diagnosis back to the hospital within 30 minutes. *Id.* at 3.

Under the terms of the contract, plaintiff was an independent contractor, not an employee or partner/member of defendant. *Id.* at 5. Apart from provisions requiring defendant to pay plaintiff a given contractual rate for the image-reading services described above, the contract provided that defendant "will . . . [w]ork together with [plaintiff] to secure credentialing" for plaintiff at any hospital (the equivalent of a doctor's hospital practice privileges). *Id.* at 4. Among other grounds for termination, the contract provided that plaintiff's retention shall be terminated "whenever he/she is denied privileges to practice at any hospital or other facility with which he/she has been affiliated during the term" of the contract. *Id.* at 5.

Plaintiff entered into the contract with defendant in 2005. Compl. ¶ 3. One of the hospitals served by the contract was the Glen Cove Hospital ("Glen Cove") in New York. *Id.*, ¶ 11. Plaintiff was credentialed by Glen Cove to perform services in 2007, and her privileges were renewed in 2008 and 2010. *Id.*, ¶ 18. The initial issuance and subsequent renewal of plaintiff's medical staff privileges at Glen Cove were managed exclusively by defendant. *Id.*, ¶ 13. Plaintiff provided services to hospitals including Glen Cove from 2007 through at least early 2011.

Over the years Glen Cove raised concerns to defendant at various times about the quality of plaintiff's services. The first time was in July 2008 when the chairman of Glen Cove's radiology department expressed "reservations" to defendant's quality assurance ("QA") department about "a few of the many teleradiology readings rendered by" plaintiff. *Id.*, ¶ 19.

2

"His comments were conveyed by [defendant] to [plaintiff] by means of a few cursory communications filtered through the IOC QA process." *Id.*, ¶ 20. Defendant did not express concern to plaintiff about these comments, and plaintiff herself never met or spoke with Glen Cove's radiology chairman at this time or any point in time before mid-2011. *Id.*, ¶¶ 21–22.

The next time was in April 2009 when the Glen Cove chairman wrote to defendant expressing concern again about certain of plaintiff's readings. *Id.*, ¶ 23. According to the complaint, defendant responded by stating that it "was aware of/agreed with his comments and had implemented a 'corrective action plan' with regard to [plaintiff's] work." *Id.*, ¶ 24. More than a year later, in August 2010, the chairman wrote again to defendant alleging two discrepancies in plaintiff's image readings, to which defendant responded by requesting that the chairman complete its QA reporting forms. *Id.*, ¶ 25.

Plaintiff alleges that defendant never advised her of the concerns that were raised in 2009 and 2010, never told her about or implemented a "corrective action plan," and otherwise "kept her in the dark about Glen Cove's growing dissatisfaction with her work." *Id.*, ¶ 26. Indeed, defendant "never expressed any concern to her about her work," and instead "frequently complimented [plaintiff] on her general professional competence." *Id.*, ¶ 30. According to plaintiff, "[h]ad [she] been aware of [defendant's] false statement [to Glen Cove] in 2009 that it intended to implement a 'corrective action plan' with respect to her, she would have immediately requested [defendant] to remove her from the [defendant's] roster of radiologists reading for Glen Cove Hospital." *Id.*, ¶ 28.

Matters came to a head with Glen Cove in late January 2011 when the chairman's representative contacted defendant raising questions again about plaintiff's work and requesting that plaintiff resign her medical staff privileges at the hospital. *Id.*, ¶¶ 32–33. According to the

3

complaint, the letter sent to defendant by the chairman's representative bore "a number of unmistakable indications that [plaintiff] was being formally investigated by the Glen Cove Hospital Medical Staff." *Id.*, ¶ 37.

One week later, one of the physicians that worked for defendant called plaintiff to ask her to resign her privileges at Glen Cove because "'the chief of radiology is not happy with your work; let's pacify him by agreeing to his request.'" *Id.*, ¶¶ 35–36. The physician assured plaintiff that resigning privileges at the hospital was "a routine step that [defendant's] teleradiologists regularly undertook and in the normal course in response to complaints from the QA departments of hospitals with which [defendant] contracted." *Id.*, ¶ 38. According to the complaint, the physician did not tell plaintiff that she was being investigated by Glen Cove or recommend that she retain counsel to advise her. *Id.*, ¶ 39. As a result, plaintiff signed and faxed to defendant a letter resigning her privileges from Glen Cove. *Id.*, ¶ 40.

Several days later, however, Glen Cove and its sister hospitals filed adverse action reports with the National Practitioner Data Bank ("NPDB") asserting that plaintiff had resigned her privileges at Glen Cove while under investigation. *Id.*, ¶ 41. Plaintiff was "shocked" to learn of the filing of the adverse action reports, and she alleges that the defendant's "physician who had solicited her Glen Cove staff resignation expressed great surprise and amazement that the reports were filed." *Id.*, ¶ 42.

Plaintiff thereafter retained counsel and, after time consuming and costly efforts, she was able to rescind her resignation. *Id.*, ¶ 45. Although Glen Cove filed supplemental reports with the NPDB to reflect that she had rescinded her resignations, the Glen Cove chairman soon initiated a corrective action proceeding in June 2011 to have the hospital's executive committee revoke plaintiff's privileges (notwithstanding that she was no longer rendering teleradiology services for

Glen Cove). *Id.*, ¶ 49. Plaintiff fought this revocation effort, disputing the criticisms of her work. *Id.*, ¶ 51. Ultimately, following multi-day hearings that took significant time, effort, and legal expense, a hospital hearing panel denied the chairman's revocation request. *Id.*, ¶ 59.

The complaint does not allege that defendant instigated or encouraged the Glen Cove chairman's effort to have her privileges revoked. Instead, it alleges that plaintiff's past favorable performance for defendant "was never called to Glen Cove's attention" by defendant. *Id.*, ¶ 54. Defendant "made no effort to refute" the charges against plaintiff, "even though it had positively evaluated her work," "outrageously solicited her resignation" from Glen Cove, and "left her to defend herself" against the revocation charges at the same time that defendant "continued to enjoy the economic fruits of its relationship" with Glen Cove and sister hospitals. *Id.*, ¶ 57.

The complaint further—and critically—alleges that, absent defendant's misconduct, plaintiff "would have refused to continue rendering teleradiology services for Glen Cove long before the chairman launched his investigation[,] thereby avoiding the NPDB adverse action filing and the 'corrective action' [revocation] hearings referred to above and the cost, expenses and damages she has suffered as a result thereof." *Id.*, ¶ 65. "Had [defendant] not acted and failed to act, as set forth above, [plaintiff's] professional reputation would not have been unfairly sullied and she would not have been made to suffer the damages alleged above." *Id.*, ¶ 68.

The complaint alleges seven causes of action: breach of contract (Count 1), breach of the implied covenant of good faith and fair dealing (Count 2), negligence (Count 3), negligent misrepresentation (Count 4), negligent infliction of emotional distress (Count 5), intentional infliction of emotional distress (Count 6), and violation of the Connecticut Unfair Trade Practices Act (Count 7).[2]

---

[2] Plaintiff has abandoned Count 8 of the complaint which alleged reckless indifference.

Plaintiff has sued only the defendant Imaging on Call, LLC, to seek damages stemming from the Glen Cove chairman's complaints, his request that she resign, the hospital's filing of adverse action reports, and the chairman's effort to revoke her hospital privileges. At oral argument, plaintiff's counsel represented that federal law otherwise bars her from filing suit against the chairman, Glen Cove, or its sister hospitals. Defendant now moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim.

## DISCUSSION

The background principles governing a Rule 12(b)(6) motion to dismiss are well established. The Court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless its factual recitations state a claim to relief that is plausible on its face. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (same). Moreover, "'[a]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to survive a motion to dismiss. *Ibid.* (quoting *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)); *see also Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014) (noting that court is "not bound to accept as true a legal conclusion couched as a factual conclusion" or "to accept as true allegations that are wholly conclusory" (citations and internal quotation marks omitted)). In short, my role in reviewing a motion to dismiss is to determine whether the complaint—apart from any of its conclusory allegations—sets forth sufficient facts to state a plausible claim for relief.

The Supreme Court has elaborated on the "plausibility" standard for evaluating a motion to dismiss:

6

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted).

It is instructive as well to consider examples in which the Supreme Court has determined that complaints have fallen short of setting forth a plausible claim for relief. In *Iqbal*, plaintiffs complained that the FBI engaged in discriminatory targeting of Arab Muslim men following the terrorists attacks of September 11, 2001. To support this claim, the complaint alleged that the FBI had arrested and detained thousands of Arab Muslim men as part of its 9/11 investigation. *Id.* at 681. This fact was insufficient to warrant a plausible inference of discrimination. In light of the origins of the 9/11 attacks, "[i]t should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." *Id.* at 682. The Supreme Court concluded that "[a]s between that obvious alternative explanation for the arrests . . . and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion." *Ibid.* (citation omitted); *see also id.* at 680 (noting that the fact allegations had not "nudged" the claim of "invidious discrimination across the line from conceivable to plausible" (internal quotation marks omitted)).

Similarly, in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), the Supreme Court considered an antitrust conspiracy complaint that was premised on factual allegations of parallel conduct by market competitors. *Id.* at 550–51. The Supreme Court acknowledged that parallel conduct was "consistent with an unlawful agreement," but "nevertheless concluded that it did not

7

plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 556 U.S. at 680 (discussing and citing *Twombly*, 550 U.S. at 567); *see also Twombly*, 550 U.S. at 555 (noting that "[f]actual allegations must be enough to raise a right to relief above the speculative level" and that a complaint "must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action" (citations and internal quotation marks omitted)).

In light of the foregoing standards, I conclude that the complaint should be dismissed. For each of plaintiff's seven causes of action, I conclude that she has neither alleged a plausible violation of a legal duty nor alleged that any such violation plausibly caused the harm that she sustained. Each of plaintiff's causes of action are discussed below.

### *Breach of Contract (Count 1)*

As to the breach of contract claim, plaintiff does not identify any contractual undertaking that defendant allegedly breached. Doc. #22 at 7–8. Nothing in the contract required defendant to alert plaintiff about any complaints from Glen Cove about plaintiff's performance. The complaint acknowledges that defendant advised her of Glen Cove's request that she resign her privileges because Glen Cove's chairman "is not happy with your work" (Compl. ¶ 36); nothing in the contract further required defendant to have furnished her a copy of Glen Cove's prior letter raising quality concerns. Moreover, nothing in the contract required defendant to give plaintiff a *Miranda*-type warning that she should consult counsel before agreeing to resign her privileges at Glen Cove. Notwithstanding plaintiff's accusation that defendant "left her to defend herself against the Glen Cove charges while it maintained an economically beneficial arrangement" with Glen Cove and its sister hospitals (Doc. #22 at 5), nothing in the contract imposed on defendant a

duty-to-defend and for defendant to come to plaintiff's rescue when the Glen Cove chairman

raised quality concerns and initiated revocation-of-privileges proceedings against plaintiff. In

short, plaintiff has not alleged facts that plausibly show a violation of any provision of the

parties' contract.

Even assuming the complaint could be interpreted to allege a plausible breach of a

contractual duty, the complaint falls well short of plausibly alleging facts to show that any breach

was the cause of harm to plaintiff. "'Causation requires [plaintiff] to satisfy two tests: first,

causation in fact, whether 'the injury [would] have occurred were it not for the actor's conduct,'

and second, proximate causation, 'whether the defendant's conduct is a substantial factor in

bringing about the plaintiff's injuries,' requiring [plaintiff] to 'prove an unbroken sequence of

events,' tying [her] injuries to [defendant's] conduct.'" *Dongguk Univ. v. Yale Univ.*, 734 F.3d

113, 130 (2d Cir. 2013) (quoting *Winn v. Posades*, 281 Conn. 50, 56, 913 A.2d 407 (2007)).[3] It

follows that "'[t]his causal connection must be based upon more than conjecture and surmise.'"

*Winn*, 281 Conn. at 57 (quoting *Boehm v. Kish*, 201 Conn. 385, 391–92, 517 A.2d 624 (1986)).

Indeed, lack of a plausible factual basis to infer causation is an immense problem for all

of plaintiff's claims. That is because the apparent causes of any harm to plaintiff in this case

were the actions of people that plaintiff cannot sue—the Glen Cove hospital and its chairman—

who raised concerns about plaintiff's work, who asked for plaintiff to resign her privileges, who

issued adverse action reports, and who later initiated a corrective action proceeding to have her

hospital privileges revoked.

There is no allegation that defendant initiated or instigated the chairman's repeated

complaints from 2008 to 2010, his request for plaintiff's resignation in 2011, or his revocation

---

[3] The contract provides that New York law applies, but plaintiff contends that New York and Connecticut law are not in conflict and has not objected to the application of Connecticut law in this case. Doc. #22 at 6–7.

efforts in 2011-12. Instead, plaintiff's entire causational theory against defendant is elliptical, conjectural, and derivative. She alleges that defendant could have taken steps along the way to make less likely her resignation, issuance of adverse action reports, or initiation of revocation proceedings. For example, she alleges that, if she had been told by defendant in 2009 of one of Glen Cove's initial complaints about her and of defendant's false response to Glen Cove that it would take corrective action, "she would have immediately requested [defendant] to remove her from the [defendant's] roster of radiologists reading for Glen Cove Hospital." Compl. ¶ 28.

But this is the epitome of after-the-fact speculation and does not rise to the level of plausibility, which requires allegations of facts beyond a "sheer possibility" of being true.[4] *Iqbal*, 556 U.S. at 678. Plaintiff's claim that she would have stopped working for Glen Cove cannot be squared with the fact that the year before—in 2008—plaintiff had been advised of quality concerns by Glen Cove but had not then sought to discontinue her services. Compl. ¶¶ 19–20. Moreover, if it is true that she would have preemptively stopped working for Glen Cove in 2009 had she only known then of its complaints about the quality of her service, this undermines the plausibility of her separate claim that, when she was advised in 2011 of complaints about her performance, she would *not* then have resigned her privileges from Glen Cove but for the fact that one of defendant's physicians allegedly downplayed the consequences of her doing so. Compl. ¶¶ 38–40. In sum, no matter how plaintiff might frame any of the causes of actions in her complaint about what defendant did or did not do, she has not plausibly alleged that these acts or omissions of defendant caused her harm.

---

[4] Although this factually dubious allegation is somewhat buried in the complaint, it is vastly important to her claim of damages in this case. After all, the remaining claims of misconduct that she alleges by defendant that took place after 2009 relate only to her eventual choice to resign her privileges from Glen Cove Hospital. But she ended up rescinding the resignation, and then the Glen Cove chairman initiated revocation proceedings that carried on through 2011-12 and which she alleges resulted in significant time and expense. There is nothing to indicate that defendant caused these later revocation proceedings, and plaintiff's only "hook" to hold defendant liable for her harm from them is her claim that, if only she had been told more by defendant in 2009, then she would have stopped working for Glen Cove and never exposed herself to these revocation proceedings more than two years later.

### *Breach of Implied Covenant of Good Faith and Fair Dealing (Count 2)*

Plaintiff does not allege a plausible breach of the covenant of good faith and fair dealing. The parties had an independent contractor relationship; there was no fiduciary or employment relationship. A good-faith-and-fair-dealing claim is not an excuse for a court to impose fiduciary obligations that a contract itself does not impose or for a court to enforce terms of a contract that do not exist. Rather, "[t]he covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 794, 67 A.3d 961 (2013) (quoting *De La Concha of Hartford, Inc. v. Aetna life Ins. Co.*, 269 Conn. 424, 433, 849 A.2d 382 (2004)).

As the Second Circuit has recognized, the implied covenant does not extend so far as to "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's benefit," and "[t]he covenant will be breached only in a narrow range of cases," because "[a] plaintiff must show substantially more than evidence that the defendant's actions were negligent or inept." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014) (citations and internal quotation marks omitted) (applying New York law). Thus, "[t]o constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith," which "means more than mere negligence" and "involves a dishonest purpose" *Capstone*, 308 Conn. at 794–95 (alteration in original) (internal quotation marks omitted) (quoting *De La Concha of Hartford, Inc.*, 269 Conn. at 433).

Plaintiff has not alleged a plausible claim of bad-faith violation of any discretionary term of the contract. As to bad faith in particular, plaintiff complains that one of defendant's physicians wrongfully induced her to resign her hospital privileges, but the complaint further alleges that the same physician "expressed great surprise and amazement" when Glen Cove followed this resignation with adverse action reports to the NPDB. Compl. ¶ 42. Plaintiff's own allegations foreclose any conclusion of bad faith.

Plaintiff also alleges bad faith on grounds that defendant "lied" when it told Glen Cove in 2009 that it was initiating a corrective action plan with plaintiff. But the "lie" in question was to Glen Cove, not to plaintiff. Even accepting that defendant lied as plaintiff alleges, there is no plausible reason—in view of its middleman role to keep both its doctors and its hospitals happy—to conclude that bad faith explains why defendant did not advise plaintiff of Glen Cove's complaint and assured Glen Cove that corrective action would be taken. In addition, as discussed above, even assuming plaintiff has plausibly alleged a breach of an implied contractual duty, she has not plausibly alleged facts showing that harm was caused by defendant's breach of this duty.

### General Negligence (Count 3)

As to plaintiff's general negligence claim, plaintiff does not identify any duty that defendant owed her apart from any duties undertaken under the terms of the contract. *See generally Bellemare v. Wachovia Mtg. Corp.*, 284 Conn. 193, 200, 931 A.2d 916 (2007) (noting distinction between tort and contract duties). Plaintiff incorrectly claims that a duty arises merely from the fact that a specific harm was foreseeable to a defendant. Doc. #22 at 10–11. But the case she cites makes clear that "[a] simple conclusion that the harm to the plaintiff was foreseeable, however, cannot by itself mandate a determination that a legal duty exists," because

there must also be a further "determination of 'the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results.'" *RK Constructors, Inc. v. Fusco Corp.*, 231 Conn. 381, 386, 650 A.2d 153 (1994) (quoting William Lloyd Prosser & W. Page Keeton, *On Torts* § 43 (5th ed.1984)); *see also Ruiz v. Victory Properties, LLC*, 135 Conn. App. 119, 124, 43 A.3d 186 (2012) (same); *Great Lakes Reinsurance (UK), PLC v. JDCA, LLC*, 2014 WL 6633039, at \*20 (D. Conn. 2014) (rejecting negligence claim for lack of existence of duty, noting that "in the context of a commercial contract, where good faith and arms-length negotiations are presumed . . . parties have a 'general right to act on [their] own interests,' . . . subject to the constraints imposed by the contract itself, and courts are hesitant to impose additional implied affirmative obligations in the contractual context" (alteration in original) (quoting *M/A–COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir. 1990)). In addition, as discussed above, even assuming plaintiff has alleged a breach of a tort duty, she has not plausibly alleged facts showing that harm was caused by defendant's breach of this duty.

### Negligent Misrepresentation (Count 4)

As to plaintiff's claim of negligent misrepresentation, "an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Coppola Const. Co. v. Hoffman Enterprises Ltd. P'ship*, 309 Conn. 342, 351–52, 71 A.3d 480 (2013) (quoting *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 626, 910 A.2d 209 (2006)). Here, plaintiff focuses solely on the conversation she had with defendant's physician leading up to her decision to resign her privileges at Glen Cove. Compl. ¶¶ 35–42, 71–75.[5]

---

[5] Plaintiff's opposition to the motion to dismiss (Doc. #22 at 12) attempts to expand the scope of the negligent misrepresentation claim beyond what is alleged in the complaint. My discussion here of the negligent

Plaintiff has barely, if at all, alleged a misstatement of fact by defendant's physician. As the complaint states, the physician told plaintiff that "the chief of radiology is not happy with your work." Compl. ¶ 36. That was admittedly true and cannot form the basis for a claim of negligent misrepresentation.

Plaintiff additionally alleges that the physician assured her that resigning one's medical privileges was no more than "a routine step" that was done "in response to complaints from the QA departments of hospitals with which [defendant] contracted." Compl. ¶ 38. Even assuming this latter statement to be a false statement of fact (as opposed to opinion), it cannot be said that plaintiff—as a licensed and board-certified physician—could have reasonably relied on this misrepresentation and thought nothing of what it meant to resign one's professional privileges at a hospital in response to complaints about the quality of her work. To the contrary, as the contract between plaintiff and defendant makes clear, the denial of privilege to practice at any hospital with which she had been affiliated was itself grounds for termination of the contract. Doc. #12-2 at 5 (Contract, ¶ 9.a.i).

The short of it is that plaintiff knew she was being asked to resign because of concerns from the hospital's chairman about the quality of her work. It is implausible to conclude that a board-certified physician like plaintiff could have reasonably relied on any statements by defendant that downplayed as "routine" the significance of her resignation. Moreover, to the extent that plaintiff faults defendant for failing to send her a copy of Glen Cove's prior complaint letter before she decided to resign, this omission does not constitute or amount to a negligent misrepresentation.[6] In addition, as discussed above, even assuming plaintiff has plausibly alleged

---

misrepresentation claim is limited to what is alleged in the complaint.

[6] As to the claim of negligent misrepresentation, even were I to conclude that plaintiff's allegations were sufficient, her potential damages for this misrepresentation may well be slight. At best, she could recover for any costs she incurred to undo her resignation (Compl. ¶ 45). For lack of causational nexus, she would have no claim

a breach of a duty, she has not plausibly alleged facts showing that harm was caused by defendant's breach of this duty.

### Negligent Inflction of Emotional Distress (Count 5)

As to plaintiff's claim of negligent inflction of emotional distress, the Connecticut Supreme Court has ruled that "[t]o prevail on a claim of negligent inflction of distress, the plaintiff is required to prove that '(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.'" *Hall v. Bergman*, 296 Conn. 169, 182 n.8, 994 A.2d 666 (2010) (quoting *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (2003)).

The complaint falls short as to the last two elements. First, beyond a conclusory allegation that plaintiff's "emotional distress was severe enough that it might result in illness or bodily harm," Compl. ¶ 72, the complaint lacks any fact allegations to allow a plausible inference that the distress experienced by plaintiff put her at risk of illness or bodily harm, much less that an illness or bodily harm was reasonably foreseeable to defendant as a result of anything wrong that it did. *See Scanlon v. Connecticut Light & Power Co.*, 258 Conn. 436, 446–47, 782 A.2d 87 (2001) (explaining elements and special foreseeability requirements). In addition, as discussed above, even assuming plaintiff has plausibly alleged a breach of a duty, she has not plausibly alleged facts showing that harm was caused by defendant's breach of this duty.

---

that the misrepresentation led to the later costs she incurred as a result of the independent and intervening decision of Glen Cove's chairman to initiate revocation proceedings once her resignation had been rescinded (Compl. ¶¶ 49–59).

***Intentional Infliction of Emotional Distress (Count 6)***

As to plaintiff's claim of intentional infliction of emotional distress, a plaintiff claiming

intentional infliction of emotional distress must establish four elements:

> (1) that the actor intended to inflict emotional distress or that he knew or should have
> known that emotional distress was the likely result of his conduct; (2) that the conduct
> was extreme and outrageous; (3) that the defendant's conduct was the cause of the
> plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was
> severe.

*Perez–Dickson v. City of Bridgeport*, 304 Conn. 483, 526–27, 43 A.3d 69 (2012) (quoting

*Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059 (2000)).

Moreover, the standard for conduct that suffices to establish a claim of intentional

infliction of emotional distress is very high:

> Liability for intentional infliction of emotional distress requires conduct that exceeds all
> bounds usually tolerated by decent society. . . . Liability has been found only where the
> conduct has been so outrageous in character, and so extreme in degree, as to go beyond
> all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in
> a civilized community. Generally, the case is one in which the recitation of the facts to an
> average member of the community would arouse his resentment against the actor, and
> lead him to exclaim, Outrageous! . . . Conduct on the part of the defendant that is merely
> insulting or displays bad manners or results in hurt feelings is insufficient to form the
> basis for an action based upon intentional infliction of emotional distress.

*Id.* at 527 (quoting *Appleton*, 254 Conn. at 210–11).

Here, the complaint is devoid of any non-conclusory factual allegations to sustain a claim

that defendant intended to cause plaintiff emotional distress. It does not allege any facts to

suggest that defendant wished to inflict distress on plaintiff. To the extent that the complaint

alleges that defendant did not relay enough information to plaintiff about Glen Cove's

complaints, there is nothing to suggest that this was part of some "atrocious" and "utterly

intolerable" plan to visit harm upon plaintiff, as opposed to any number of other reasons why

defendant might not share all information it receives from hospitals about its doctors. Similarly,

16

to the extent that the complaint faults defendant's physician for treating resignation of privileges as a "routine step," any inference that this was done to inflict harm on plaintiff is dispelled by plaintiff's own allegation that the physician himself was surprised and amazed that the hospital responded with the filing of adverse action reports.

As in *Iqbal* and *Twombly*, the facts of the complaint fall well short of the plausibility standard in light of obvious alternative explanations. In addition, as discussed above, even assuming plaintiff has plausibly alleged a breach of a duty not to intentionally inflict emotional distress, she has not plausibly alleged facts showing that harm was caused by defendant's breach of this duty.

### Connecticut Unfair Trade Practices Act (Count 7)

The Connecticut Unfair Trade Practices Act ("CUTPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Conn. Gen. Stat. § 42–110b(a), and it provides for a private cause of action to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b," Conn. Gen. Stat. § 42–110g.[7]

The standard for determining whether a business practice violates CUTPA is:

(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen].

*Journal Pub. Co. v. Hartford Courant Co.*, 261 Conn. 673, 695, 804 A.2d 823 (2002) (alterations in original) (citation and internal quotation marks omitted).

---

[7] I do not resolve the parties' dispute whether the harm alleged here satisfies the "ascertainable loss" requirement.

Plaintiff alleges that defendant "committed an unfair or deceptive act or practice in that it encouraged [plaintiff] to resign her privileges at Glen Cove Hospital and at the other [sister] hospitals without informing her that she was under investigation and without disclosing to her its lie to the Glen Cove chairman that she was subject to a corrective action plan by [defendant]." Compl. ¶ 89. Because plaintiff's CUTPA claim relies on the same conduct for which I have previously concluded that no plausible contract or tort claim has been alleged, the complaint likewise fails to plausibly allege a proper CUTPA claim. In addition, as discussed above, even assuming a violation of CUTPA, the complaint does not plausibly allege facts showing that any harm to plaintiff was caused by defendant's breach of its duties.

CONCLUSION

For the foregoing reasons, defendant's motion to dismiss (Doc. #12) is GRANTED. Although I dismiss this case, nothing in this ruling should be understood to discredit plaintiff or the value of her skills and services. So far as I know, plaintiff is a talented and experienced medical professional who has furnished—and continues to furnish—vital services to hundreds or thousands of patients. Nothing in my ruling suggests that there was any basis for the complaints lodged by the Glen Cove chairman about the quality of plaintiff's services. And I have no reason on this record to doubt that plaintiff sustained considerable emotional, reputational, and financial costs as a result of the actions initiated by the Glen Cove hospital and chairman. But neither the chairman nor his hospital are defendants here. My sole ruling now is that plaintiff has not alleged any plausible claims against the one intermediary company defendant before me.

The Clerk of Court shall close this case.

It is so ordered.

Dated at Bridgeport this 12th day of January 2015.

Jeffrey Alker Meyer
Jeffrey Alker Meyer
United States District Judge